Cecil McLENDON, Don Vandertulip, Jimmie Cartharn, and Konrad Trojaniar, Plaintiffs,

v.

CONTINENTAL GROUP, INC., Defendant.

Civ. A. No. 83–1340.

United States District Court, D. New Jersey.

Jan. 22, 1985.

1496

Rothbard, Harris & Oxfeld by Emil Oxfeld, Newark, N.J., Plotkin & Jacobs by Robert Plotkin, Chicago, Ill., for plaintiffs.

Williams, Caliri, Miller & Otley by Terrence Dwyer and Barry T. Moskowitz, Wayne, N.J., for defendant.

SAROKIN, District Judge.

This action is before the court on defendant's motion to dismiss Counts I and II of plaintiff's Amended Complaint for failure to state a claim, Fed.R.Civ.P. 12(b)(6), and for summary judgment on Counts III and IV of that Complaint. At issue are important legal questions involving the scope and application of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, in a civil context. Underlying these broad issues, however, are significant allegations that defendant laid off members of the plaintiff class illegally and, specifically to deprive them of particular employee benefits to which they were soon to become entitled. The case therefore involves a fundamental question regarding the extent to which an industry may effectuate economies by depriving employees of prospective benefits which they otherwise would have received but for the actions taken by their employer.

FACTS

This is a class action brought on behalf of four named plaintiffs and all others similarly situated. Plaintiffs allege that they are all former employees of the defendant, each of whom was laid off as he approached the time at which he would become eligible for two varieties of "Magic Number" employee benefits, embodied in the 1977 collective bargaining agreement between defendant and the United Steel Workers ("USW"). These benefits are and would be available to employees who have been laid off for two years or who have lost their jobs as a result of a plant closing. An employee becomes eligible for "Rule of 65" benefits if, on the last day worked, he has twenty years of service with defendant and if, at any time within two years of his last day worked, the employee's age and years of service total at least sixty-five years. Similarly, 70/75 benefits are available to employees with at least fifteen years of service who are fifty years of age or older and whose age and service total seventy or more, or who are any age, with age and service totaling seventy-five or more. *See* Complaint, ¶¶ 11–13. It should be noted that for the purpose of these benefits, years of service include the first two years following a layoff. This so-called "creep provision" operates such that the rehiring of a laid-off employee for even one day commences a new two-year period, for the purposes of both calculating years of service and determining eligibility for Rule of 65 benefits. Aff. of Stephen C. Rexford, ¶¶ 16, 17, 19.

Plaintiffs contend that, in order to reduce the amount of Magic Number benefits to be paid to employees, defendant implemented a "capping program," the result of which was the layoff of hundreds of Continental employees who were close to satisfying, but had not yet satisfied, the requirements for such benefits. Furthermore, plaintiffs allege, defendant has not recalled these workers, despite the occurrence of job openings to which they were arguably entitled. This too, plaintiffs allege, was a series of decisions improperly motivated by a desire to avoid paying these types of benefits in the future. Complaint, ¶ 20.

In answer to these allegations, defendant essentially pleads economic necessity. During the 1970s, defendant contends, the can industry as a whole suffered a severe decline. Can purchasers began to manufacture their own cans or to utilize plastic containers or other alternatives to metal cans. Technological changes resulted in the conversion from three- to two-piece cans, requiring fewer workers to assemble.

These circumstances caused decreases in production, plant closings and the layoff of workers. The can industry was forced to implement extensive austerity measures.

These austerity measures were primarily directed to reducing labor costs. For example, defendant attempted to limit the number of temporary employees hired, by controlling inventories and regulating the timing of vacations and use of overtime. Additionally, Continental employed a "cap and shrink" strategy, whereby plants would be allocated a maximum number of employees, which number would then shrink by attrition until the plant could be closed down. Defendant admits that "Continental undeniably did look at pension costs when deciding what plants to shut down and cap." However, it argues, "the decision to cap and shrink was not made solely on the basis of pension costs. A given plant's age, capital depreciation, condition, layout, machinery, customer base, manufacturing effectiveness and capability, product mix, geographical proximity to markets, proximity to transportation, lease provisions and numerous other factors were also considered." Rexford Aff., ¶ 29. Of course, employee benefits in general, and Magic Number benefits in particular, were a major expense incurred by Continental: Magic Number benefits provide for the payment of an employee's pension at an earlier age, in addition to a special monthly supplement payable until the age of 62 or the obtaining of other long-term employment. Additionally, these benefits were not paid out of a pension fund, but rather, were unfunded and thus payable out of a given year's revenues. Hence they are seen as particularly costly by the industry, including defendant.

Alleging that defendant's actions with respect to the plaintiff class violate RICO and ERISA, plaintiffs bring this action seeking declaratory and injunctive relief as well as damages. Related actions have been brought in Los Angeles, California, Pittsburgh, Pennsylvania and in Alabama. The Los Angeles case, captioned *Amaro v. Continental Can Company* (No. 82–3984) was filed on August 9, 1982 and challenged

Continental's practices of curtailing operations and laying off workers in order to prevent plaintiffs from attaining eligibility for particular employee benefits. This case was dismissed on December 15, 1982 on grounds of *res judicata,* based upon a prior arbitration between Continental and the USW concerning these layoffs, but, on January 23, 1984, the Court of Appeals for the Ninth Circuit reversed. 724 F.2d 747. The Pittsburgh case, *Gavalik v. Continental Can Company* (No. 81–1519) was filed on September 9, 1981 and challenged practices similar to those challenged here, as well as a particular instance in which plaintiffs alleged that defendant relocated a facility in order to deprive them of Magic Number benefits. In *Gavalik,* the court denied defendant's motion to dismiss for failure to exhaust grievance procedures set forth in the parties' collective bargaining agreement. Defendant's motion to strike plaintiff's jury demand was, however, granted and class certification was denied as untimely. In light of the latter ruling, another class action was filed by Continental employees on September 28, 1982, alleging generally the same facts and cause of action as in *Gavalik.* These two cases have been consolidated. Finally, the Alabama action, originally filed in state court and removed to the United States District Court for the Northern District of Alabama, *Amosa v. Continental Group, Inc.,* CV80–L–1730S, differs from the Los Angeles and Pittsburgh cases in that it sets forth causes of action in common law breach of contract, fraud and civil conspiracy, rather than based upon ERISA. Furthermore, in the Alabama action, plaintiffs amended their complaint to name the USW as a defendant, alleging that if there existed a duty to exhaust arbitration remedies, the union had failed adequately to represent plaintiffs in doing so.

## DISCUSSION

### A. *Counts III and IV: The ERISA Claims*

Counts III and IV of plaintiffs' complaint request declaratory and injunctive relief

and damages as a result of defendant's alleged violation of section 510 of ERISA, 29 U.S.C. § 1140. That section states, in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter or the Welfare and Pension Plans Disclosure Act.

Defendant moves to dismiss these counts on two separate grounds. First, defendant argues that the Magic Number benefits here at issue are not the type of benefits covered by ERISA. Second, defendant claims that these counts should be dismissed because plaintiffs have failed to exhaust the arbitration remedy to which they must submit under the terms of the existing collective bargaining agreement.

The gravamen of defendant's argument that Magic Number benefits are not governed by the provisions of ERISA is the contention that these benefits are at their essence layoff benefits and not retirement benefits. Continental asserts that the legislative history shows such benefits to be beyond the purview of those wrongs which Congress intended to right when it passed ERISA.

 This argument is wholly without merit. First, the language of the statute, as quoted *supra*, is perfectly clear on the scope of ERISA: it discusses employees' right "under the provisions of an employee benefit plan," and not just with respect to retirement plans. Indeed, ERISA defines "employee benefit plan" as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). Furthermore, an "employee

welfare benefit plan" is defined to include "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment...." 29 U.S.C. § 1002(1)(A). Defendant concedes that the plan here at issue involves "layoff benefits." Therefore the court concludes that the Magic Number benefits are governed by ERISA. *See, e.g., Mamula v. Satralloy,* 578 F.Supp. 563, 566 (S.D.Ohio 1983) (insurance plan for, *inter alia,* laid off employees based upon length of service falls within ERISA); *EEOC v. Westinghouse Electric Corp.,* 577 F.Supp. 1029, 1034 (D.N.J.1982) (layoff income and benefit plan a "welfare plan" within the terms of ERISA); *Donovan v. Carlough,* 576 F.Supp. 245, 246 (D.D.C.1983) (underemployment benefit plan an employee welfare benefit plan under ERISA). *See also Franchise Tax Board of the State of California v. Construction Laborers Vacation Trust for Southern California,* 679 F.2d 1307, 1308–09 (9th Cir.1982) (vacation trust fund a benefit plan under ERISA), *vacated on other grounds,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1213–14 (8th Cir.) (whole-life insurance plan an employee welfare benefit plan under ERISA), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *Blue Cross and Blue Shield of Alabama v. Peacock's Apothecary, Inc.,* 567 F.Supp. 1258, 1267 (N.D.Ala.1983) (prescription drug benefit plans constitute employee benefit plans within the meaning of ERISA); *Hayden v. Texas-U.S. Chemical Co.,* 557 F.Supp. 382, 385 (E.D.Tex.1983) (permanent and total disability plan an employee welfare benefit plan as defined in ERISA); *United Food and Commercial Workers Local 545 Health and Welfare Fund v. Health Enterprises of America, Inc.,* 543 F.Supp. 340, 341 (E.D.Mo.1982) (health insurance plan an employee benefit plan within the meaning of ERISA); *Petrella v. NL Industries, Inc.,* 529 F.Supp. 1357, 1361–62 (D.N.J.1982) (severance pay plan a welfare plan for ERISA purposes). *See generally Donovan v. Dillingham,* 688 F.2d 1367, 1371 (11th Cir.1982) (en banc).

This holding derives strength from the particular nature of these benefits: they are covered by the Continental Pension Plan, and are apparently referred· to as pension benefits throughout that plan. Moreover, like pension benefits, they are triggered by the discontinuation of work by an employee of a certain age after a certain amount of service. Finally, in many cases, Magic Number benefits will result in the receipt of traditional pension benefits at an earlier age. It is clear, therefore, that these benefits are portrayed as pensions, are akin to pensions, and affect employees' pension rights. *See generally* 29 U.S.C. § 1002(2) (definition of pension plan); *Commercial Mortgage Insurance, Inc. v. Citizens National Bank of Dallas,* 526 F.Supp. 510, 515 (N.D.Tex.1981) (broad definition of pension plan). *See also Peckham v. Board of Trustees of the International Brotherhood of Painters and Allied Trades Union,* 653 F.2d 424, 426 (10th Cir. 1981) (plan was a "classic example of an ERISA employee pension benefit plan" where it "was established to provide retirement benefits for Employees...."); *Murphy v. Inexco Oil Co.,* 611 F.2d 570, 575 (5th Cir.1980) (an employee pension benefit plan is one "designed for the purpose of paying retirement income whether as a result of their express terms or surrounding circumstances"); *Bauman v. Bish,* 571 F.Supp. 1054, 1063 (N.D.W.Va.1983) (employee stock ownership plan deemed a pension plan).

 This strengthens the conclusion that these benefits are covered by ERISA, even when it is construed as narrowly as defendant argues it should be. Defendant's motion to dismiss Counts III and IV on this ground is, therefore, denied.[1]

The second ground urged by defendant in support of its motion to dismiss Counts III and IV of the Complaint presents more difficult questions. Defendant contends that plaintiffs should have exhausted the arbitration remedy available to them, and as they have not, their case should be dismissed. Defendant offers three bases for this contention: first, that the 1977 collective bargaining agreement between Continental and the USW requires such arbitration; second, that the behavior of related plaintiffs in similar actions demonstrates that arbitration is required; and third, that the caselaw establishes that claims such as these are not exempt from arbitration on the theory that they are statutory claims. Plaintiffs contend that they were not required to grieve or arbitrate a claim seeking to vindicate an unwaivable statutory right, arguing that this position derives

---

1. Defendant argues that the legislative history of ERISA indicates that the purpose of the Act was to protect the "integrity of retirement pension benefits through minimum vesting standards." Defendant's Brief at 50. That this was *a* purpose of ERISA cannot be gainsaid. However, "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v.·GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), and should be given full effect. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979), citing *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). *See also Dow Chemical Co. v. United States Environmental Protection Agency,* 605 F.2d 673, 688 (3d Cir. 1979) ("the language actually used in a statute is the most determinative guide to the meaning of any piece of legislation"). Of course, legislative history is always available as a guide to construction although "a salutary rule of statutory construction prohibits resort to extrinsic aids when a statute on its face appears to be clear and unambiguous." *Commercial Mortgage Insurance, supra,* 526 F.Supp. at 514, citing *United States v. American Trucking Associations,* 310 U.S. 534, 542–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). The language of the statute could not be clearer than it is here. Nor has defendant pointed to any legislative history that would contradict that express language. Congressional concern with respect to pensions does not support the proposition that other employee benefits were to be excluded from coverage under ERISA; indeed, there is legislative history which buttresses plaintiffs' contention that precisely the type of benefits here at issue were intended to fall within ERISA's scope. *See, e.g., Legislative History of the Employee Retirement Income Security Act of 1974,* Committee on Labor and· Public Welfare, United States Senate (1976) at 1815–16.

support from both caselaw and from the legislative history of ERISA.

Plaintiffs' obligation to exhaust their arbitration remedy stems, argues defendant, from the 1977 collective bargaining agreement between the USW and Continental. Article 13 of that agreement creates a complex four-step grievance process, to handle "any difference between the Local Management and the Union or employees as to the interpretation or application of or compliance with this Agreement respecting wages, hours, or conditions of employment," including "any dispute over whether a complaint is subject to these procedures." Section 13.2. The Pension Agreement, in turn, provides that

> If, during the term of this Agreement, any differences shall arise between the Company and any Employee who shall be an applicant for a lump sum retirement allowance, pension or deferred benefit as provided in this Agreement, as to whether or not such Employee is entitled to or as to the amount of such lump sum retirement allowance, pension or deferred benefit, such differences ... may be taken up as a grievance in accordance with the applicable provisions of the Master Agreement ....

Defendant's Brief at 23–24.

■ Initially, the court notes that the language of the Agreement cited by defendant is entirely precatory: differences "*may* be taken up as a grievance." Although plaintiffs do not argue this point, the court reads this language as making a grievance procedure available to Continental employees, but not mandating that they utilize it. This being the case, and the court is unaware of any evidence to the contrary, plaintiffs' suit is well within the bounds of the collective bargaining agreement and pension agreement. For this reason alone, defendant's motion to dismiss must be denied. *See generally John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964) (a party has no obligation to arbitrate issues which it has not contracted to arbitrate); *Eberle Tanning Co. v. Section 63L*, 682 F.2d 430, 433 (3d Cir.1982) (citing cases).

■ However, even if the language of the agreement were as defendant reads it, arbitration would not be mandated in this instance. The court recognizes the strong public policy which favors arbitration in general. *See, e.g., United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960); *Southland Corp. v. Keating*, —— U.S. ——, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *Sharon Steel Corp. v. Jewell Coal and Coke Co.*, 735 F.2d 775, 777–78 (3d Cir.1984); *Adams v. Gould*, 687 F.2d 27, 31 (3d Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 348 (1983). However, that policy is inapplicable where, as here, the rights that plaintiffs seek to vindicate are not merely contractual, but arise from a federal statute. Such is the teaching of a triad of Supreme Court cases, the latest decided just this past term. In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court held that a discharged employee who had submitted his race discrimination claim to binding arbitration and lost could nonetheless institute suit under Title VII of the Civil Rights Act of 1964. The Court stated that the employee had both contractual and statutory rights which he was entitled to assert—"two strings to his bow." 415 U.S. at 54, 94 S.Ct. at 1022. However, the existence of the former, even where a requirement of mandatory and binding arbitration, *id.* at 41–42, 94 S.Ct. at 1016–1017, did not dilute the latter.

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress.

*Id.* at 49–50, 94 S.Ct. at 1020. Just as "final responsibility for the enforcement of Title VII is vested with federal courts," *id.*

at 44, 94 S.Ct. at 1018, so is the arbitrator's jurisdiction, as well as his expertise, limited to interpreting the collective bargaining agreement. *Id.* at 53, 94 S.Ct. at 1022. Hence, the plaintiff in *Alexander* was able to bring his action in two separate fora. Logically, he could also have chosen one of these fora but not the other, as plaintiffs have done here. *See, e.g., Marchese v. Shearson Hayden Stone, Inc.,* 734 F.2d 414, 419–21 (9th Cir.1984) (action brought under Commodities Exchange Act); *Peabody Galion v. Dollar,* 666 F.2d 1309, 1319–23 (10th Cir.1981); *Smallwood v. National Can Co.,* 583 F.2d 419, 421 (9th Cir.1978) (citing cases); *Gibson v. Local 40, Supercargoes and Checkers of the International Longshoremen's and Warehousemen's Union,* 543 F.2d 1259, 1266–67 n. 14 (9th Cir.1976); *Leone v. Mobil Oil Corp.,* 523 F.2d 1153, 1155–59 (D.C.Cir. 1975); *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309, 1316 (7th Cir.1974) (citing cases); *Cobb v. Lewis,* 488 F.2d 41, 47–49 (5th Cir.1974) (citing cases).

The Court reinforced the *Alexander* holding in *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). There, the Court held that employees who had unsuccessfully submitted their claim, for wages allegedly due, to an arbitration committee, as required by their collective bargaining agreement, could nonetheless bring a separate action, based upon the same facts, under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* The Court thus extended the *Alexander* holding to cases involving issues which, like those implicated by ERISA, are "at the heart of the collective bargaining process." 450 U.S. at 738, 101 S.Ct. at 1443. The Court based such decision first upon the fact that an employee's union might "without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration," this because "a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation deal possible." 450 U.S.

at 742, 101 S.Ct. at 1446. Second, as in *Alexander,* the Court questioned the competence of arbitrators to decide statutory questions. *Id.* at 743, 101 S.Ct. at 1446.

Because the arbitrator is required to effectuate the intent of the parties rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights.

... not only are arbitral procedures less protective of individual statutory rights but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief.

*Id.* at 744–45, 101 S.Ct. at 1447 (citation and footnote omitted).

■ Finally, this past term, a unanimous Court once more rejected "the contention that an award in an arbitration proceeding brought pursuant to a collective-bargaining agreement should preclude a subsequent suit in federal court." *McDonald v. City of West Branch, Michigan,* — U.S. ——, 104 S.Ct. 1799, 1802, 80 L.Ed.2d 302 (1984). Citing the inadequacies of arbitration and union representation previously discussed in *Alexander* and *Barrentine,* 104 S.Ct. at 1803–04, the Court extended their holding to the context of employment termination, and allowed an employee whose discharge from a local police department had been arbitrated, to file a lawsuit based upon the same facts, under 42 U.S.C. § 1983. The Court has thus not waivered in its determination to protect plaintiffs' statutory rights, even at the expense of the federal policy favoring arbitration. *See also U.S. Bulk Carriers, Inc. v. Arguelles,* 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971) (Seaman's Wage Act claims need not be arbitrated); *McKinney v. Missouri-Kansas-Texas Railroad Co.,* 357 U.S. 265, 268–70, 78 S.Ct. 1222, 1224–26, 2 L.Ed.2d 1305 (1958) (Universal Military Training and Service Act claim need not be arbitrated); *Wilko v. Swan,* 346 U.S. 427, 430–38, 74 S.Ct. 182, 184–89, 98 L.Ed. 168 (1953) (clause requiring arbitration of Securities Act claim void). Further lower

courts have applied this holding to ERISA, *see, e.g., Amaro v. Continental Can Co.,* 724 F.2d 747 (9th Cir.1984); *Air Line Pilots Ass'n v. Northwest Airlines, Inc.,* 627 F.2d 272, 277–78 (D.C.Cir.1980); *Delgrosso v. Spang and Co.,* 586 F.Supp. 177, 179–82 (W.D.Pa.1983) (claims asserted under 29 U.S.C. § 1104(a)(1)); *Lewis v. Merrill Lynch, Pierce, Fenner & Smith,* 431 F.Supp. 271, 274–78 (E.D.Pa.1977); *cf., Robbins v. Prosser's Moving and Storage Co.,* 700 F.2d 433, 441–43 (8th Cir.1983) (en banc) (ERISA rights not subject to arbitration, in part because of the language of the pension trust agreement), *aff'd,* — U.S. ——, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984),[2] as well as to other statutes, regulations and common law doctrines. *See, e.g., Lake Communications, Inc. v. ICC Corp.,* 738 F.2d 1473, 1482 (9th Cir.1984) (antitrust statutes); *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367, 1375–76 (9th Cir.1984) (California common law of wrongful termination); *Marshall v. N.L. Industries, Inc.,* 618 F.2d 1220, 1222 (7th Cir. 1980) (Occupational Safety and Health Act); *Carothers v. Western Transportation Co.,* 554 F.2d 799, 806 (7th Cir.1977) (I.C.C. regulation); *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 538 F.2d 532, 535–39 (3d Cir.), *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976) (Securities Exchange Act of 1934 and Rule 10b–5). These cases persuade the court, as they persuaded Judge Bloch in the Pittsburgh litigation and the Ninth Circuit in the Los Angeles litigation, that plaintiffs' claim is not arbitrable.[3] Defendant argues that the above cited cases are inapposite because, unlike Title VII, FLSA and section 1983 rights, for example, ERISA rights are not "substantive," but are, like those rights granted by the Labor Management Rela-

tions Act, merely contractual rights, the enforcement of which is provided for by federal statute and occurs in federal court. *See* 29 U.S.C. § 185; *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra; United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Those rights, arising out of collective bargaining agreements, must first be arbitrated if the agreement so requires. The rights here at issue, however, are not merely those that exist in the collective bargaining agreement; indeed, based on the evidence before the court, it is difficult to discern where or how that agreement may have been violated, if at all, by the alleged actions of defendant. Rather, the rights granted plaintiffs by section 510 of ERISA, 29 U.S.C. § 1140, *supra,* include the right not to be fired "for the purpose of interfering with the attainment of any right to which [they] may become entitled under the plan ...." Unlike the cases cited by defendant, *see, e.g., Anderson v. Alpha Portland Industries, Inc.,* 727 F.2d 177 (8th Cir.1984); *Michota v. Anheuser-Busch, Inc.,* 526 F.Supp. 299, 318–22 (D.N. J.1980), *rev'd on other grounds,* 670 F.2d 387 (3d Cir.1982), what is at issue here is not the enforcement of contractual rights, for which ERISA merely provides a federal forum, but the enforcement of the substantive right against discrimination on the basis of pension eligibility. Just as Title VII does not guarantee employment, section 510 of ERISA does not guarantee pension benefits; similarly, as Title VII prohibits discrimination on the basis of race with

**2.** This past term, the Supreme Court in *Schneider Moving & Storage Co. v. Robbins,* — U.S. ——, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984), agreed that the trust agreement at issue did not give rise to a duty to arbitrate. The Court did not address the issues involved herein. It did, however, express skepticism as to the arbitrability of certain ERISA claims, holding that absent recourse to the weapons of strikes or boycotts, 104 S.Ct. at 1849, or a guarantee that the Union would fairly represent pension fund trustees in

a dispute with an employer, 104 S.Ct. at 1851, a presumption of arbitrability was not appropriate in the context of such a dispute.

**3.** Judge Bloch recently reaffirmed this decision in considering the consolidated cases now before him, as well as in *Delgrosso v. Spang and Co., supra,* 586 F.Supp. at 181. The Ninth Circuit's decision can be found at 724 F.2d 747 (1984).

respect to such employment, so does section 510 prohibit discrimination with respect to pension benefits on the basis of one's proximity to such benefits.

Nor is the legislative history of ERISA to the contrary. As finally adopted, the Act provides for claims procedures within every benefit plan, through which an aggrieved party can apply specifically in the event of a denial of a claim for benefits. 29 U.S.C. § 1133. The courts have construed this section to require the exhaustion of such internal remedies in the event of a denial of such a claim. *See, e.g., Wolf v. National Shopmen Pension Fund,* 728 F.2d 182, 185, 191 (3d Cir.1984) (citing cases); *Amato v. Bernard,* 618 F.2d 559, 566–69 (9th Cir.1980). No such denial is at issue in the instant case, which involves allegations of discriminatory layoffs so that application for such benefits may never be made.

Nothing in the legislative history of ERISA indicates that this sort of situation was subject to compulsory arbitration. Senator Vance Hartke of Indiana proposed an amendment which would have made claims such as these justiciable by an administrative mechanism to be established by the Labor Department, *see* II *Legislative History, supra,* at 1774–75, 1835–37. This amendment was defeated. As proposed, the amendment provided that such administrative mechanism "shall not displace the grievance-arbitration proceedings provided by a collective bargaining agreement if its procedure and proceeding would satisfy the arbitration deferral principles of the National Labor Relations Board were the dispute to constitute an unfair labor practice." *Id.* at 1835. Neither this language nor the colloquy between Senator Hartke and Senator Williams cited by defendant provide for the arbitration of disputes not arbitrable under the terms of the collective bargaining agreement. As discussed, *supra,* this dispute arises as a result of the alleged violation of plaintiffs' statutory rights, and not their contractual rights. As to the latter, section 1133 provides for their internal adjudication; as to the former, the statute is silent and the legislative history indicates that, as Senator Javits stated initially, employees complaining under the discrimination provision of ERISA have the same rights to go to court as those alleging race or sex discrimination. *Id.* at 1641–42. In the area of race discrimination, for example, the Supreme Court preserved this right against an attack for failure to exhaust arbitration remedies in *Alexander v. Gardner-Denver, supra.* With respect to discrimination on the basis of pension status, this court recognizes that right here.

In so doing, the court follows the well-reasoned opinion of the Ninth Circuit in the Los Angeles litigation, and rejects the nonbinding opinion of the Seventh Circuit in *Kross v. Western Electric Co., Inc.,* 701 F.2d 1238, 1243–46 (7th Cir.1983). The latter does not confront the contrary Supreme Court and other precedent discussed, *supra.* Moreover, it makes clear that the district court's decision to dismiss for failure to exhaust arbitral remedies was reviewable only for abuse of discretion. 701 F.2d at 1244–45. Thus, even under *Kross,* this court could exercise its discretion, and eschew dismissal on these grounds. *Amaro* dictates that it do so. As the Ninth Circuit wrote:

> We are faced solely with an alleged violation of a protection afforded by ERISA. There is no internal appeal procedure either mandated or recommended by ERISA to hear these claims. Furthermore, there is only a statute to interpret. That is a task for the judiciary, not an arbitrator. *Alexander,* 415 U.S. at 57 [94 S.Ct. at 1024]. Therefore, a "primary reason for the exhaustion requirement," *Amato,* 618 F.2d at 568; *see Kross,* 701 F.2d at 1245 (quoting *Amato* ), is not present in this case. Accordingly, we find *Kross* to be based on a flawed premise and we refuse to follow it.

724 F.2d at 751–52.[4]

Finally, defendant argues that plaintiffs have somehow waived their right to bypass

---

**4.** The court believes that the Third Circuit would also reject *Kross.* Thus, in *Viggiano v.*

arbitration by virtue of the action of previous plaintiffs in related suits. Arguing that plaintiffs' interests are indistinguishable from those of the United Steel Workers, defendant relies upon the fact that arbitration was instituted and failed in Los Angeles; that it was instituted and withdrawn in Pittsburgh; and that the USW is defending a claim against it in the Alabama litigation on the grounds of failure to exhaust arbitration/grievance remedies. Plaintiffs argue that section 510 rights are unwaivable.

The court agrees with plaintiffs' position. As the Supreme Court stated in *Alexander v. Gardner-Denver:*

> ... we think it clear that there can be no prospective waiver of an employee's rights under Title VII. It is true, of course, that a union may waive certain statutory rights related to a collective activity, such as the right to strike. These rights are conferred on employees collectively to foster the processes of bargaining and may properly be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices.

415 U.S. at 51, 94 S.Ct. at 1021 [citations omitted]. *See also McDonald v. City of West Branch, supra,* 104 S.Ct. at 1802–04 and nn. 8, 12; *Barrentine, supra,* 450 U.S.

at 740, 101 S.Ct. at 1444; *Wilko v. Swan, supra,* 346 U.S. at 434–38, 74 S.Ct. at 186–89 (1953) (no waiver of rights under section 14 of the Securities Act of 1933); *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 900, 89 L.Ed. 1296 (1945) (no waiver of rights under FLSA). That logic applies with equal force here; the individual's right not to be discriminated against on the basis of pension status is absolute, and represents an equally clear congressional command. *See* II Legislative History, *supra,* at 1641 (Remarks of Senator Javits). *See generally Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."), citing *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361–62, 100 S.Ct. 1723, 1726–27, 64 L.Ed.2d 354 (1980); *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981). Moreover, as defendant concedes, Defendant's Brief at 38, the court's conclusion that section 510 rights are statutorily substantive ones explodes any argument of waiver. Indeed, if employees may choose to proceed under the contract, by arbitration, or under statute, in the courts, *see supra* at 1502, then there is no question but that an initial choice of the former cannot jeopardize the subsequent choice of the latter in the same, or *a fortiori,* another proceeding. Thus, even assuming the identity of plaintiffs here with those in the Los Angeles and Pittsburgh actions, and with the USW in the Alabama action, waiver was neither statutorily permissible nor logically possible. In the absence of such

*Shenango China Division of Anchor Hocking Corp.,* 750 F.2d 276, 280–281 (3d Cir.1984), the court required arbitration of a dispute concerning employee benefits arising under a collective bargaining agreement, while carefully distinguishing between the rights thus involved and rights derived from statute. That statutory rights are indeed different was made clear by *Kovats v. Rutgers,* 749 F.2d 1041, 1048 (3d Cir. 1984), where the court refused to give preclusive effect to an arbitration proceeding in an action brought pursuant to 42 U.S.C. § 1983 (citing *McDonald v. City of West Branch, supra* ). *See*

*also Moteles v. University of Pennsylvania,* 730 F.2d 913, 921 (3d Cir.1984) ("The lawfulness of a collective bargaining agreement under Title VII is determined by the court, but any dispute as to the contract's grant of seniority is to be determined by arbitration."); *NLRB v. General Warehouse Corp.,* 643 F.2d 965, 969–70 and n. 19 (3d Cir.1981) (National Labor Relations Board correct in assuming that arbitrator's decision was based upon the contract and not the statute); *Ayres v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 538 F.2d at 535–39.

identity, which is only speculative, it would also be unfair.

For all of the above reasons, defendant's motion to dismiss Counts III and IV of the Complaint, or for summary judgment, is denied.

### B. *Counts I and II: The RICO Claims*

Counts I and II of plaintiffs' Complaint alleges that, in carrying out its "unlawful scheme and course of conduct" whereby Continental laid off employees so as to deprive them of their Magic Number benefits, defendant used the mails in violation of 18 U.S.C. § 1341 and the telephone in violation of 18 U.S.C. § 1343. Plaintiffs further allege "an unlawful conspiracy between defendant and various of its officials and employees," Complaint, ¶ 25, and conclude that defendant has violated and continues to violate 18 U.S.C. §§ 1962(c) and (d). These sections state:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section.

Plaintiffs demand declaratory and injunctive relief from such violations in Count I of their Complaint and treble damages in Count II.

Defendant moves to dismiss these counts in whole or in part on five separate grounds: (1) that plaintiffs have failed to plead mail or wire fraud, or failed to plead such fraud with the particularity required by Federal Rule of Civil Procedure 9(b); (2) that plaintiffs have failed to plead a conspiracy, in that Continental cannot be held to conspire with its own employees or officers; (3) that the Complaint fails to set forth the racketeering-related injury for which RICO provides redress; (4) that

plaintiffs have failed adequately to allege an enterprise as defined by 18 U.S.C. § 1961(4); and (5) that injunctive relief is not available to private parties under RICO. Although defendant's motion addresses itself to the technical failings of plaintiffs' Complaint, underlying it is a sense that the injury suffered by plaintiffs, if any, ought not fall under the aegis of a statute that was designed to counter the real peril of organized crime. Nonetheless, a proper analysis of a RICO complaint must compare the language of such complaint to the statute from which it arises.

### 1. *The mail fraud/wire fraud allegations*

Defendant's motion to dismiss plaintiffs' RICO counts for failure adequately to plead mail and wire fraud is supported by two separate arguments: first, that plaintiffs have failed to allege a scheme to defraud in that no fraudulent misrepresentation or detrimental reliance has been alleged; and second, that no specific intent to defraud has been alleged, as is required by the statutes at issue. Further, defendant argues that plaintiffs' allegations of fraud are not pled with the particularity required by Federal Rule of Civil Procedure 9(b).

In order to set forth a cause of action under RICO, 18 U.S.C. § 1962(c); a plaintiff must allege, in part, "a pattern of racketeering activity." Such a pattern includes two acts of racketeering activity, 18 U.S.C. § 1961(5); included within the definition of racketeering activity are violations of the federal statutes prohibiting mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1). Plaintiffs allege that defendant has committed multiple violations of the mail and wire fraud statutes and that, as a result, the predicate offense necessary to invoke RICO have been alleged.

The essential elements of an offense under 18 U.S.C. §§ 1341 and 1343 are (1) the existence of a scheme to defraud; (2) the use of the mails or wires in furtherance of such scheme; and (3) culpable participation by the defendant. *Pereira v.*

*United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Pearlstein,* 576 F.2d 531, 534 (3d Cir.1978). *See also United States v. Giovengo,* 637 F.2d 941, 944 (3d Cir.1980), *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981) (wire fraud statute interpreted *in pari materia* with mail fraud statute).[5] Although it is not clear from the language of the Complaint, plaintiffs claim to allege violations of these statutes in two respects. First, plaintiffs allege that defendant's capping program secretly and fraudulently deprived plaintiffs of economic benefits to which they were entitled. Second, plaintiffs claim that defendant negotiated the Rule of 65 benefits fraudulently, in that it never intended to pay them. These facts, although inartfully pled, sufficiently state violations of the mail and wire fraud statutes and therefore the claims will not be dismissed on these grounds. However, the court agrees with defendant that the circumstances of fraud are not here alleged with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). Plaintiffs will be directed to amend their complaint accordingly should they wish to retain these counts.

 Defendant's first argument, that plaintiffs have failed to set forth the required misrepresentations or omissions is without merit. A course of conduct may comprise a scheme or artifice to defraud, even absent particular fraudulent state-ments or omissions. Indeed, the statute discusses two separate types of mail/wire fraud offenses: one may act pursuant to a "scheme or artifice to defraud" *or* one may act "by means of false or fraudulent pretenses, representations or promises." Indeed, the Third Circuit has recently joined a number of other courts which have given the statute such a disjunctive meaning. Thus, in *United States v. Frankel,* 721 F.2d 917, 921 (3d Cir.1983), the court held

> ... the opinions of this court lend support to the proposition that "scheme or artifice to defraud" is to be read independently of "obtaining money by false pretenses." ... Schemes to defraud come within the scope of the statute even absent a false representation.

721 F.2d at 921.[6] Here, plaintiffs have alleged both types of fraud: they allege a scheme whereby defendant, under the guise of economic necessity, selectively laid off employees in order to deprive them of economic benefits to which they were about to become entitled, and they also allege misrepresentations in the negotiating of Rule of 65 benefits after the inception of the capping program.

 As to the former, if true, such scheme violated ERISA; as such, it contravened important public policies. This alone constitutes fraud. *See Parr v. United States,* 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960), citing *Badders v. United States,* 240 U.S. 391, 393, 36

5. The mail fraud statute states:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

6. The court cited a long line of cases for this proposition. 721 F.2d at 920, citing, *e.g., United States v. Scott,* 701 F.2d 1340, 1343–44 (11th Cir.1983); *United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Townley,* 665 F.2d 579, 585 (5th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. Halbert,* 640 F.2d 1000, 1007 (9th Cir.1981); *United States v. States,* 488 F.2d 761, 764 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

S.Ct. 367, 367–68, 60 L.Ed. 706 (1916). Just as fraud exists where an official breaches his or her duty of honest, faithful and disinterested service to the public, *see, e.g., United States v. Mandel*, 591 F.2d 1347, 1360–62 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), so may it exist where an industrial organization breaches its statutory duty not to deprive employees of their pension benefits based upon such employees' status with respect to those benefits. As the court stated in *Mandel*:

> As a result of the failure [of the courts or Congress] to limit the term "scheme or artifice to defraud" to common law definitions of fraud and false pretenses and schemes prohibited by State law, the mail fraud statute generally has been available to prosecute a scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing.

591 F.2d at 1361. *See also United States v. Curry*, 681 F.2d 406, 410 (5th Cir.1982); *United States v. Shamy*, 656 F.2d 951, 957 (4th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.); *U. S. v. Van Dyke, III*, 605 F.2d 220 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). Indeed, while no caselaw corresponds precisely to the facts of the instant matter, the Supreme Court has long made clear that the mail fraud statute is to be interpreted broadly in general, and not limited to common law concepts of fraud or false pretenses. *Durland v. United States*, 161 U.S. 306, 313–14, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896). Thus, it has frequently been used to prosecute cases involving political corruption. *See, e.g.,*

*United States v. Rendini*, 738 F.2d 530 (1st Cir.1984); *United States v. Gann*, 718 F.2d 1502, 1503–04 (10th Cir.1983); *United States v. Buckley*, 689 F.2d 893, 897–98 (9th Cir.1982), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983); *United States v. Margiotta, supra*, 688 F.2d at 120–30; *United States v. Barber*, 668 F.2d 778, 784 (4th Cir.) *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. Pintar*, 630 F.2d 1270, 1279–80 (8th Cir.1980); *United States v. Diggs*, 613 F.2d 988, 997–99 (D.C.Cir. 1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); *United States v. Mandel, supra*, 591 F.2d at 1361–62; *United States v. Rauhoff*, 525 F.2d 1170, 1175–76 (7th Cir.1975); *United States v. Bush*, 522 F.2d 641, 646–47 (7th Cir.1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).[7] It has been used to address election fraud. *See, e.g., United States v. Clapps*, 732 F.2d 1148, 1152–53 (3d Cir.1984); *United States v. States, supra; United States v. Lewis*, 514 F.Supp. 169, 175 (M.D.Pa.1981). And it has been used to address various types of business-related fraud, most of which involve some sort of breach of fiduciary duty, *see, e.g., United States v. Venneri*, 736 F.2d 995, 996–97 (4th Cir.1984); *United States v. Shamy, supra*, 656 F.2d at 957; *United States v. Von Barta*, 635 F.2d 999, 1005–07 (2d Cir.1980); *United States v. Bohonus*, 628 F.2d 1167, 1172–73 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *United States v. Bryza*, 522 F.2d 414, 421–23 (7th Cir.1975), *cert. denied*, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Pinto*, 548 F.Supp. 236, 245–46 (E.D.Pa.1982); *United States v. Kelly*, 507 F.Supp. 495, 499–503 (E.D.Pa.1981) (employee's unauthorized use of employer's computer),[8] al-

---

**7.** These cases are premised upon the notion that the schemes at issue served to defraud citizens of their intangible right to honest and faithful service on the part of their public servants. While not ruling on this specific issue, the Court of Appeals for the Third Circuit has held that such intangible rights may be the subject of a mail fraud prosecution. *United States v. Boffa*, 688 F.2d 919, 925–26 (3d Cir.1982), *cert. denied*,

460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983).

**8.** The Third Circuit apparently sanctions this use of the statute as well, at least in the labor union context. *Boffa, supra*, 688 F.2d at 930–31 (mail fraud statute violated by scheme to deprive employees of contractual benefits and faithful services of union officers).

though many involve other fraudulent schemes utilizing, for example, credit cards, *see United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), or checks. *See, e.g., United States v. Johnston*, 547 F.2d 282, 284 (5th Cir.), *cert. denied*, 431 U.S. 942, 97 S.Ct. 2660, 53 L.Ed.2d 261 (1977). Finally, and perhaps most significantly, the mail fraud statute has been utilized to prosecute fraudulent schemes engendered by the violation of other statutes. *See, e.g., United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir.1984) (Copyright Act); *United States v. Miller*, 545 F.2d 1204, 1216 n. 17 (9th Cir.1976) (tax evasion) (citing cases); *United States v. Dixon*, 536 F.2d 1388, 1399 (2d Cir.1976) (Securities Act); *United States v. Brewer*, 528 F.2d 492, 495 (4th Cir.1975) (state tax laws and the Jenkins Act).[9]

■■■■■ There is thus no question but that the scheme alleged by plaintiffs is, if true, violative of both statute and of the strong public policy expressed therein. It may also violate some fiduciary duty owed to plaintiffs by defendant as a result of the relationship established by the parties' collective bargaining agreement. *See Boffa, supra*, 688 F.2d at 930. A "scheme or artifice to defraud" is thus alleged. Much less clear are the false representations claimed by plaintiff to be set forth in the Complaint. There, plaintiffs state only

that defendant's "capping program" was performed in secret, "unbeknownst to plaintiffs." Complaint, ¶¶ 18, 20. In their brief, however, plaintiffs appear to claim that, in the course of collective bargaining, defendant falsely represented that Rule of 65 benefits would become available to employees whom it intended would be subject to the already ongoing capping program. They thus claim that "Continental never intended to fulfill its contractual promise to provide Rule of 65 benefits." Plaintiffs' Brief at 34. Moreover, in light of defendant's submissions, the court finds that plaintiffs may be able to prove that defendant laid off workers in order to deprive them of their pension benefits while, claiming—as they are now—that other, objective economic criteria were at work. Such theory is also absent from the Complaint as drafted. Plaintiffs are directed, therefore, to amend their complaint in order to state with specificity the misrepresentations or deception upon which their mail fraud is based. *See generally Eaby v. Richmond*, 561 F.Supp. 131, 136–38 (E.D.Pa.1983). They are further directed to amend the Complaint to allege and set forth the basis for their allegation that defendant's fraud was knowing and willful, as is required under the mail fraud and wire fraud statutes.[10]

9. The Third Circuit has held that the National Labor Relations Act does not give rise to intangible rights the violation of which necessarily creates criminal liability under the mail fraud statute. *Boffa, supra*, 688 F.2d at 927–30. Reasoning that the NLRA is remedial only, and that it set up a detailed administrative structure—the National Labor Relations Board—to resolve labor disputes, the court held that "Congress did not intend unfair labor practices to have any criminal consequences." *Id.* at 930. *See also United States v. Sheeran*, 699 F.2d 112, 115 (3d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Defendant does not argue that such is the case here. Moreover, the court has earlier discussed the breadth of the remedy sought by ERISA and has recognized the lack of a governmental or private structure for the resolution of disputes such as these. *See supra* at 1500–1505. Such factors distinguish this case from *Boffa* and section 540 of ERISA from section 7 of the NLRA.

10. Such amendment is required, as defendants argue, by Federal Rule of Civil Procedure 9(b) which requires that "the circumstances constituting fraud ... shall be stated with particularity." The Third Circuit does not require that allegations of date, place or time be pleaded in order to comport with the rule. "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984). However, fraud is nonetheless a charge that ought not be lightly made and, if plaintiffs wish to maintain the allegation that defendants defrauded them by virtue of certain representations or omissions in the course of negotiation, they should amend their pleadings to allege the five elements of common law fraud. *See Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99 (3d Cir.1983), quoting C. Clark, *Code Pleading*, § 48, at 312 (2d ed. 1947). *See generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1296, at 400 (1969).

### 2. *The Conspiracy Allegations*

Plaintiffs allege that defendant's conduct in unlawfully instituting its capping program "was part of and resulted from an unlawful conspiracy between defendant and various of its officials and employees and perhaps with others unknown to plaintiffs." Complaint ¶ 25. Defendant moves to dismiss such conspiracy claim, which is a part of Counts I and II of the Complaint, on two grounds. First, defendant contends that a corporate entity cannot, as a matter of law, conspire with its own officials and employees. Second, defendant argues that recent Third Circuit precedent makes clear that RICO, 18 U.S.C. § 1962(d), "prohibits conspiracies to knowingly further the affairs of the enterprise; mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)". *Seville, supra,* 742 F.2d at 792 n. 8.

 In evaluating these arguments, the court notes that, technically, defendant's arguments do not address the Complaint herein, because plaintiffs claim a conspiracy not only between defendant and its employees, but additionally "perhaps with others unknown to plaintiffs". Similarly, plaintiffs have been careful to state that the predicate acts alleged were "part of and resulted from" such conspiracy, implying agreement to commit more than merely the predicate acts. While the court recognizes that, although fraud is alleged, every element of the RICO offense here charged need not be pleaded with particularity, *Seville, supra,* 742 F.2d at 792 n. 7, as well as the liberality with which pleadings should be judged in general, Fed.R. Civ.P. 8(a), 8(e)(1); *see generally Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80 (1957), the court nonetheless cannot find that these allegations sufficiently put defendant on notice of the conspiracy claim against it. The court therefore directs that plaintiffs replead their conspiracy allegation with greater specificity. In so doing, plaintiffs should be aware that in *Seville,* the Third Circuit unambiguously stated that a RICO conspiracy is not properly alleged if based merely upon an agreement to commit the predicate acts. *See also United States v. Brooklier,* 685 F.2d 1208, 1222 (9th Cir. 1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *United States v. Phillips,* 664 F.2d 971, 1014 (5th Cir. 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Anderson,* 626 F.2d 1358, 1368–69 (8th Cir.1980).

 Similarly, defendant should plead with some specificity the persons with whom defendant allegedly conspired, if any. Moreover, if such persons are officers or employees of defendant, plaintiffs should be prepared to prove, and must allege in good faith, that such officers or employees so acted in pursuit of their own ends, rather than for the benefit and on behalf of the defendant corporation. *See, e.g., Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731, 2741 and n. 15, 81 L.Ed.2d 628 (1984) (citing cases); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 469–70, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962); *Doherty v. American Motors Corp.,* 728 F.2d 334, 339–40 (6th Cir.1984) (civil rights claim) (citing cases); *H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239, 244 (5th Cir.1978) (antitrust); *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974); *Johnston v. Baker,* 445 F.2d 424, 427 (3d Cir.1971) (landlord/tenant dispute) cited in *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 894 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Denenberg v. American Family Corp of Columbus, Ga.,* 566 F.Supp. 1242, 1253 (E.D.Pa.1983) (civil conspiracy under Pennsylvania law) (citing cases); *Nurse Midwifery Associates v. Hibbett,* 549 F.Supp. 1185, 1189 (M.D.Tenn.1982) (citing cases); *Jewel Foliage Co. v. Uniflora Overseas Florida,* 497 F.Supp. 513, 518 (M.D.Fla.1980); *Rushton v. Shea,* 419 F.Supp. 1349, 1364 and n. 90 (D.Del.1976); *Lattimore v. Loews Theatres, Inc.,* 410 F.Supp. 1397, 1402 (M.D.N.C.1975). *Cf.,*

*People by Abrams v. II Cornwell Co.*, 695 F.2d 34, 41 (2d Cir.1982) (partnership may conspire with partner, distinguishing it from corporation).

 Plaintiffs are correct that, where criminal charges are involved, courts have held that corporations and their employees may conspire one with the other; as stated by the First Circuit

There is a world of difference between invoking the fiction of corporate personality to subject a corporation to civil liability for acts of its agents and invoking it to shield a corporation or its agents from criminal liability where its agents acted on its behalf.

*United States v. Peters*, 732 F.2d 1004, 1008 n. 7 (1st Cir.1984) (emphasis in original).[11] *See also United States v. Wise*, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); *United States v. S & Vee Cartage Co.*, 704 F.2d 914, 920 (6th Cir.1983); *United States v. Hartley*, 678 F.2d 961, 970–72 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 603 (5th Cir.1981); *Novotny v. Great American Federal Savings & Loan Ass'n*, 584 F.2d 1235, 1258 (3d Cir.1978) (en banc) (dictum), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979),[12] citing *Mininsohn v. United States*, 101 F.2d 477, 478 (3d Cir.1939); *United States v. Consolidated Coal Co.*, 424 F.Supp. 577, 579, 579–81 (S.D.Ohio 1976).[13] Plaintiffs argue that because RICO is to be interpreted the same in the civil context as it is in the criminal, and because criminal cases allow prosecutions for conspiracies between corporations and their employees, then such conspiracies ought also to be allowed in the RICO civil context. Plaintiff's Brief at 39, citing *Kimmel v. Peterson*, 565 F.Supp. 476, 491 n. 17 (E.D.Pa.1983).[14] The court disagrees.

11. *Peters* also states: "A corporate officer, acting *alone* on behalf of the corporation, could not be convicted of conspiring with the corporation. *See United States v. Carroll*, 144 F.Supp. 939, 941–42 (S.D.N.Y.1956). But this is not such a case." 732 F.2d at 1008 n. 6. *Peters* involved a conspiracy to defraud by virtue of the actions of several agents of the corporation, on behalf of the corporation.

12. *Novotny* is cited by plaintiffs for the proposition that intracorporate conspiracy may state a cause of action under 42 U.S.C. § 1985(3). *See* Plaintiff's Brief at 39. *Novotny*, however, involved allegations of conspiracy as between various officers of the corporate defendant and not between the corporate defendant and such officers. 584 F.2d at 1257–58.

13. *Consolidated Coal* moderates its holding by noting that "When separate individual judgments and decisions are capable of being made by both a corporation and one or more of its employees," then a conspiracy between a corporation and its employees may exist. Presumably, where a person acts solely through or in his capacity for a corporation, *Consolidated Coal* would bar conspiracy prosecution. Hence, the case is not dissimilar from those cited in the civil realm.

14. *Kimmel v. Peterson* states merely that decisions in criminal RICO cases have precedential value in civil RICO cases, with respect to the issue of whether involvement with organized crime must be alleged. *See infra* at 1512–1513

n. 16. It is thus improperly cited for the proposition that the "requirements for stating criminal RICO violations and civil RICO violations are the same". Plaintiff's Brief at 39. It is, of course, true that the *elements* to be proven in a civil RICO case are the same as in a criminal RICO prosecution. *See, e.g., Hudson v. LaRouche*, 579 F.Supp. 623, 626 (S.D.N.Y.1983); *Eisenberg v. Gagnon*, 564 F.Supp. 1347, 1352 (E.D. Pa.1983); *Eaby v. Richmond*, 561 F.Supp. 131, 134 (E.D.Pa.1983). Thus, courts have rejected the notion that one need not, in a civil case, plead the existence of an enterprise affecting interstate commerce, in which defendant participated through a pattern of racketeering activity, 18 U.S.C. § 1962(c), exactly as in a criminal cases, for these are "the essential elements of a substantive RICO offense." *Hudson, supra*, 579 F.Supp. at 626. Courts have, however, varied the standard of proof as between civil and criminal cases. Thus, in a criminal case, the traditional "beyond a reasonable doubt" standard prevails, while in the civil action, plaintiff need only prove a violation by a preponderance of the evidence. *Eaby, supra*, 561 F.Supp. at 133–34 (citing cases). *See also Hudson, supra*, 579 F.Supp. at 626 n. 2. Here too, the court does not engraft new meaning onto established elements of the RICO cause of action. Rather, it merely defines conspiracy as is appropriate in civil, rather than criminal cases, where corporate form is being utilized to subject a corporation to liability, rather than shield it from criminal prosecution. *See supra* at 1510–11. Such is also consistent with the Third Circuit's holding

Recognizing, as it must, that RICO is here being utilized in order to obtain treble damages not otherwise available under ERISA, which constitutes plaintiffs' real basis for relief, the court is not inclined to allow plaintiffs to treat this matter as one in which every advantage of a RICO criminal prosecution nonetheless accrues to the civil plaintiff. A civil suit is here before the court; it should be treated as such for the purposes of deciding whether defendant may appropriately be said to have conspired with its employees. *See Chambers Development Co., Inc. v. Browning-Ferris Industries,* 590 F.Supp. 1528, 1541–42 (W.D.Pa.1984) (corporation and employees are not capable of RICO civil conspiracy); *Yancoski v. E.F. Hutton & Co., Inc.,* 581 F.Supp. 88, 97 (E.D.Pa.1983); *Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206, 209 (E.D.Mich.1981); *contra, Callan v. State Chemical Co., Inc.,* 584 F.Supp. 619, ·623 (E.D.Pa.1984); *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299, 1307 n. 9 (D.Colo. 1984); *Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231, 1241 (S.D. N.Y.1983).[15]

Therefore, the court hereby directs plaintiffs to amend their complaint within twenty days to allege a conspiracy (1) not based solely upon an agreement to commit the predicate acts charged and (2) that either names parties not employees or officers of defendant or, if employees or officers are named, alleges in good faith that such employees or officers acted in pursuit of individual benefits, rather than those of de-

fendant. Pending such re-pleading, defendant's motion to dismiss plaintiff's conspiracy allegations is denied without prejudice.

### 3. *Racketeering*

Defendant's primary attack on Counts I and II of the Complaint is one that is, by now, familiar to the courts and commentators. Like so many others charged under the terms of civil RICO, defendant finds itself accused of racketeering activity, 18 U.S.C. § 1961(1), and even a pattern thereof, 18 U.S.C. § 1961(5), and responds with incredulity, that though it may have violated ERISA, it is no racketeer. *See* Defendant's Brief at 61; Defendant's Reply Brief at 27; Defendant's Supplemental Letter Briefs (2/10/84) at 3–4, (8/2/84) at 3, (9/18/84) at 4. Reminding the court that the overriding purpose of the RICO statute, is "the eradication of organized crime in the United States, *see United States v. Turkette,* 452 U.S. 576, 589, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981), quoting 84 Stat. 923 (Congressional Statement of Findings and Purpose), defendant joins the chorus of those voicing the inapplicability of such purpose, and of the statute, to them. It thus seeks dismissal of the RICO counts of the Complaint.

Defendant does so here by arguing primarily that the Complaint fails to set forth "racketeering related injury." Defendant's Brief of 61–70; Defendant's Reply Brief at 24–27.[16] In so doing, defend-

---

that section 1962(d) does not "radically alter traditional conspiracy doctrine." *United States v. Riccobene,* 709 F.2d 214, 224–25 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). *See generally Haroco, Inc. v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 404–05 (7th Cir.1984); *United States v. Local 560, International Brotherhood of Teamsters,* 581 F.Supp. 279, 327–28 (D.N.J.1984).

**15.** Those cases holding that, in civil RICO cases, a corporation can conspire with its agent for purposes of section 1962(d) do so not on the ground that civil and criminal RICO should be interpreted alike, as plaintiffs argue, but based upon the courts' judgment that "RICO should be concerned with intracorporate conspiracies."

*Saine, supra,* 582 F.Supp. at 1307, citing *Mauriber, supra,* 567 F.Supp. at 1241. This court believes that such concern can be vindicated without so thoroughly demolishing the corporate veil.

It should also be noted that, as in this case, *Callan* found a sufficient conspiracy to exist based upon plaintiff's complaint pleading that the defendant corporation conspired with its "employees, agents *and others." Callan, supra,* 584 F.Supp. at 623. Here, plaintiffs' complaint states "perhaps ... others," and the court has, accordingly, required them to re-plead the appropriate paragraph.

**16.** Defendant also hints that the Complaint should be dismissed for failure to allege a nexus between defendant and organized crime, *De-*

ant relies on the language of the statute authorizing civil suits such as these. That language states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). It argues that the "by reason of a violation of section 1962" language means that one is subject to civil suit only for the activities prohibited by that section, *i.e.*, the investment of income derived from a pattern of racketeering or the collection of an unlawful debt in an interstate enterprise, 18 U.S.C. § 1962(a), maintenance of an interest or control in an interstate enterprise through a pattern of racketeering activity or through collection of an unlawful debt, 18 U.S.C. § 1962(b), participation in or conduct of an interstate enterprise through a pattern of racketeering activity or collection of an unlawful debt, 18 U.S.C. § 1962(c), or conspiracy to do any of the above. 18 U.S.C. § 1962(d). Hence, defendant contends, this language requires the injury alleged to be other than that resulting merely from the predicate acts which make up the "pattern of racketeering activity" charged; rather, it must be racketeering injury of the sort intended to be addressed by RICO and accordingly specified in section 1962. Defendant argues that the Complaint herein is deficient in that plaintiffs allege "an unlawful scheme" as the cause of their injuries—the same unlawful scheme that constitutes the predicate acts and, as such, not injury resulting from an enterprise having been run through a pattern of racketeering activity. Defendant's Brief at 69; Defendant's Reply Brief at 27.

Currently, the circuits are split on the question of whether racketeering-related injury needs to be alleged. *Compare Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 494–96 (2d Cir.1984) (racketeering-related injury required) [17] *with Haroco, supra*, 747 F.2d at 387–99 (no such requirement); *Alexander Grant & Co. v. Tiffany Industries, Inc.*, 742 F.2d 408, 413 (8th Cir.1984) (rejecting requirement of racketeering-related injury in part as an effort to inject organized crime nexus requirement into RICO). District courts hold similarly conflicting views; while the courts of this circuit uniformly reject such requirement, *see, e.g., Joseph v. Algamene Bank Nederland, N.V.*, 592 F.Supp. 141, 147 (W.D.Pa. 1984); *Chambers Development Co., Inc. v. Browning-Ferris, Industries*, 590 F.Supp. 1528, 1539–40 (W.D.Pa.1984); *In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation*, 583 F.Supp. 1388, 1430–31, 1434–37 (E.D.Pa.1984) (citing cases); *Yancoski v. E.F. Hutton & Co., Inc., supra*, 581 F.Supp. at 96–97; *Kirschner v. Cable/Tel Corp.*, 576 F.Supp. 234, 244

---

fendant's Brief at 64, 68–69, though this is an argument abandoned in Reply and not mentioned at oral argument. It is also a position which has been rejected by every Court of Appeals to have considered it, *see, e.g., Haroco, supra*, 747 F.2d at 392–95; *Alcorn County, Miss. v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1167 (5th Cir.1984), citing *Owl Construction Co., Inc. v. Ronald Adams Contractor, Inc.*, 727 F.2d 540 (5th Cir.1984) (per curiam); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 21 (2d Cir.1983); *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1287 n. 6 (7th Cir.1983); *Bennett v. Berg*, 685 F.2d 1053, 1063–64 (8th Cir.1982), *aff'd*, 710 F.2d 1361, 1364 (8th Cir.) (en banc), *cert. denied*, —— U.S. ——, 104 U.S. 527, 78 L.Ed.2d 710 (1983), including the Third Circuit, albeit in the criminal RICO context. *See United States v. Vignola*, 464 F.Supp. 1091, 1096–97 (E.D.Pa.) *aff'd mem.*, 605 F.2d 1199 (3d Cir. 1979), citing *United States v. Forsythe*, 560 F.2d 1127, 1136 (3d Cir.1977) ("The Legislative intent was to make RICO violations dependent upon behavior, not status'). Insofar as the existence of such nexus is the basis for defendant's motion, such motion must, therefore, be denied. *See generally* Note, *Civil RICO: The Temptation and Impropriety of Judicial Restrictions*, 95 Harv.L.Rev. 1101, 1106–1109 (1982).

**17.** *Sedima* has, of course, been followed by other panels of the Second Circuit, *see Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 516–18 (2d Cir.1984); *Furman v. Cirrito*, 741 F.2d 524 (2d Cir.1984), and by the district courts therein. *State of New York v. O'Hara*, 595 F.Supp. 1101, 1102 (W.D.N.Y.1984); *Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108, 1113 (S.D.N.Y.1984); *Gramercy 222 Residents Corp. v. Gramercy Realty Associates*, 591 F.Supp. 1408, 1414 n. 10 (S.D. N.Y.1984).

(E.D.Pa.1983); *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 567 F.Supp. 1146, 1157 (D.N.J.1983 (Debevoise, J.) *aff'd in part, rev'd on other grounds*, 742 F.2d 786 (3d Cir.1984), some other courts disagree, to a greater or lesser extent. *See, e.g., Lopez v. Dean Witter Reynolds, Inc.*, 591 F.Supp. 581, 587–88 (N.D.Cal.1984) (allowing suits based upon predicate acts injuries only if enterprise alleged to be organized solely for criminal purposes); *Clute v. Davenport Co.*, 584 F.Supp. 1562, 1573 (D.Conn.1984); *Freschi v. Grand Coal Venture*, 583 F.Supp. 780, 787–88 (S.D.N.Y.1984); *Bruns v. Ledbetter*, 583 F.Supp. 1050, 1056 (S.D.Cal.1984); *Bulk Oil (Zug) A.G. v. Sun Co., Inc.*, 583 F.Supp. 1134, 1143–44 (S.D.N.Y.1983); *Morosani v. First National Bank of Atlanta*, 581 F.Supp. 945, 949–51 (1984); *Willamette Sav. & Loan v. Blake & Neal Finance Co.*, 577 F.Supp. 1415, 1427–30 (D.Ore.1984); *In re Action Industries Tender Offer*, 572 F.Supp. 846, 851–52 (E.D.Va.1983); *Guerrero v. Katzen*, 571 F.Supp. 714, 718–19 (D.D.C.1983); *Noland v. Gurley*, 566 F.Supp. 210, 218 (D.Colo. 1983); *Barker v. Underwriters at Lloyd's, London*, 564 F.Supp. 352, 358 (E.D.Mich. 1983); *Johnsen v. Rogers*, 551 F.Supp. 281, 285–86 (C.D.Cal.1982); *North Barrington Development, Inc. v. Fanslow*, 547 F.Supp. 207, 211 (N.D.Ill.1980); *Harper v. New Japan Securities International, Inc.*, 545 F.Supp. 1002, 1007–08 (C.D.Cal.1982); *Van Schaick v. Church of Scientology of California, Inc.*, 535 F.Supp. 1125, 1137 (D.Mass.1982); *Landmark Savings & Loan v. Rhoades, supra*, 527 F.Supp. at 208–09; *Wilcox v. Ho-Wing Sit*, 586 F.Supp. 561, 568–69 (N.D.Cal.1984). *But see, e.g., Econo-Car International, Inc. v. Agency Rent-A-Car, Inc.*, 589 F.Supp. 1368, 1373–78 (D.Mass.1984); *Hulse v. Hale Farms Development Corp.*, 586 F.Supp. 120, 122–23 (D.Conn.1984); *Laterza v. American Broadcasting Co., Inc.*, 581 F.Supp. 408, 414 (S.D.N.Y.1984); *Ralston v. Capper*, 569 F.Supp. 1575, 1580

(E.D.Mich.1983); *Crocker National Bank v. Rockwell International*, 555 F.Supp. 47, 49–50 (N.D.Cal.1982). Finally, the commentators are also divided as to whether courts should or should not limit the scope of RICO in general, and whether they should or should not require racketeering related injury in particular. *Compare, e.g.*, A Bridges, *Private RICO litigation Based Upon "Fraud in the Sale of Securities,"* 18 Ga.L.Rev. 43, 67–72 (1983) (racketeering related injury should be required); Comment, *Reading the "Enterprise Element Back Into RICO: Sections 1962 and 1964 (c)*, 76 N.W.U.L.Rev. 100, 125–32 (1981) (same) *with* Note, *Civil RICO, supra*, 95 Harv.L.Rev. at 1109–14 (such injury should not be required); Blakey, *the RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg*, 48 Notre Dame L.Rev. 237, 328–30 (1982) (same); Blakey & Gettings, *Racketeer Influenced and Corrupt Organization (RICO): Basic—Concepts—Criminal and Civil Remedies*, 53 Temp. L.Q. 1009, 1042–43 (1980) (same).[18]

█ The court here finds no reason to disagree with its colleagues within this circuit who have held that racketeering related injury need not be alleged in order to set forth a civil RICO cause of action. Indeed, the court agrees with the Seventh Circuit that such a requirement flies in the face of Congress' desire to cut a "broad swath ... in order to address the evil it sought."

Both the proponents and the opponents of RICO recognized the extraordinary breath of its terms. The opponents argued that the breadth of the statute might chill civil liberties and the proponents of RICO defended the broad terms on the grounds that narrower terms would provide loopholes through which the primary targets might escape. Indeed, the unifying thread of RICO's legislative development was a desire to avoid creating loopholes for clever defendants and their lawyers. "In short, Congress chose to provide civil remedies

---

**18.** Professor Blakey, a draftsman of RICO has been criticized for his fervent support of a broad interpretation of the Act and for assuming such an authoritative stance with respect to it. *See Sedima, supra*, 741 F.2d at 486; Bridges, *supra*, 18 Ga.L.Rev. at 76–77 n. 165.

for an enormous variety of conduct, balancing the need to redress a broad social ill against the virtues of tight, but possibly overly astringent, legislative draftsmanship."

*Haroco, supra,* 747 F.2d at 390, quoting *Schacht v. Brown,* 711 F.2d 1343, 1353–55 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 654 (7th Cir.1984). Such congressional desire has been recognized by the Supreme Court decisions construing RICO's criminal provision, *see Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (interpreting "interest" in § 1963(a)(1) broadly, citing liberal construction provision of RICO and legislative history); *United States v. Turkette, supra,* (interpreting RICO enterprise requirement broadly, in light of broad Congressional statement of purpose), and by the near unanimity of federal courts' rejection of the notion that civil RICO requires some nexus between the defendant and organized crime. *See supra,* at 1512–1513 n. 16. Though the court recognizes that civil RICO may, as the Second Circuit notes, be stretched beyond the boundaries of Congress' purposes by suits such as these, *see Sedima, supra,* 741 F.2d at 487–88, such determination is one best left to the legislative branch which carefully drafted this statute, *see Iannelli v. United States,* 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975), and decreed that it be broadly construed. *Turkette, supra,* 452 U.S. at 587, 101 S.Ct. at 2530.

Courts should not be left to impose liability based on their own tacit determination of which defendants are affiliated with organized crime. Nor should they create standing requirements that would

preclude liability in many situations in which legislative intent would compel it. Complaints that RICO may effectively federalize common law fraud and erode recent restrictions on claims for securities fraud are better addressed to Congress than to courts.

Note, *supra,* 95 Harv.L.Rev. at 1120–21. *See also Haroco, supra,* 747 F.2d at 392; *Alexander Grant & Co. v. Tiffany Industries, supra,* 742 F.2d at 412; *Sedima, supra,* 741 F.2d at 510 (Cardamone, J., dissenting); *Bankers Trust Co. v. Rhoades, supra,* 741 F.2d at 524 (Cardamone, J., dissenting); *Furman v. Cirrito, supra,* 741 F.2d at 532–33 (Pratt, J., dissenting from denial of rehearing); *Schacht v. Brown, supra,* 711 F.2d at 1361; *Bennett v. Berg, supra,* 685 F.2d at 1064.

Moreover, the requirement sought to be introduced by plaintiff is an untenable one. First, it gives rise to difficult problems of definition: what is a "racketeering related injury"? *See, e.g., Haroco, supra,* 747 F.2d at 389; *Alexander Grant, supra,* 742 F.2d at 413; *In re Catanella, supra,* 583 F.Supp. at 1437. So "slippery" is the concept that even those courts adopting it have failed to define it, *see, e.g., Sedima, supra,* 741 F.2d at 496; *see also Haroco, supra,* 747 F.2d at 389 (citing cases), or have refused to find such injury to have occurred. *Catanella, supra,* 583 F.Supp. at 1437. Thus, in order to find racketeering-related injury, it appears that the court would be required to refer to concepts already rejected, such as a nexus to organized crime or a so-called "competitive injury."[19] *See Haroco, supra,* 747 F.2d at 391–95; *Alexander Grant, supra,* 742 F.2d at 413. Nor, finally, ought the court import from the antitrust laws the meaning of the term "by reason of." In

---

**19.** A few courts have held that civil RICO does not protect those who have suffered directly through the operation of a business through a pattern of racketeering, but only those injured as competitors. *See, e.g., Bankers Trust Co. v. Feldesman,* 566 F.Supp. 1235, 1241 (S.D.N.Y. 1983); *North Barrington v. Fanslow, supra,* 547 F.Supp. at 210–11. This analysis, also based upon antitrust analogy, is not urged by defendant and has been rejected by each Circuit to

have considered it, including the Second. *Sedima, supra,* 741 F.2d at 496; *Bankers Trust Co. v. Rhoades, supra,* 741 F.2d at 516 n. 6, *Bunker Ramo, supra,* 713 F.2d at 1288; *Schacht v. Brown,* 711 F.2d at 1358; *Bennett v. Berg,* 685 F.2d at 1059. *See also Callan v. State Chemical Co., supra,* 584 F.Supp. at 622; *In re Catanella, supra,* 583 F.Supp. at 1431–32 (collecting cases), cited in *Haroco, supra,* 747 F.2d at 392. This court chooses not to adopt it *sua sponte.*

the antitrust arena, plaintiffs are required to allege and prove an "antitrust injury" of the type Congress intended to prevent. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). However, it is clear from the legislative history that such restriction on standing was not intended to be made a part of RICO, *see,* Seiling, *Standing Rules and the RICO Treble Damage Action,* Materials on RICO, 533 (Cornell Inst. on Org. Crime, G. Robert Blakey, ed., (1980), which was, for example, intended to destroy the property interests of organized crime, even at the expense of free competition. *See Schacht v. Brown, supra,* 711 F.2d at 1357–58; *Bennett v. Berg, supra,* 685 F.2d at 1059; *Catanella, supra,* 583 F.Supp. at 1431–34; *Kimmel v. Peterson,* 565 F.Supp. at 493–95; Note, *supra,* 95 Harv.L.Rev. at 1111–1113.

■ In sum, the court here refuses to engraft a racketeering-related injury requirement onto RICO, and finds persuasive the arguments of those courts which have similarly refused to do so. However, even if such requirement were adopted, the court agrees with plaintiffs that it would be satisfied here. Plaintiffs complain of injury resulting from defendant's capping program as a whole. The capping program, in turn, was furthered by defendant's predicate racketeering acts, Complaint ¶ 24; however, it was more than merely a series of violations of the mail and wire fraud statutes. What injured plaintiffs was not any one particular letter or telephone call, but the underlying scheme as a whole, which enabled defendant to perpetrate an ongoing systematic corporate-survival strategy to violate plaintiffs' hard-earned rights to employee benefits, in violation of ERISA. As such, plaintiff has adequately alleged injury beyond that caused by the predicate acts of mail and wire fraud. *See, e.g., Alexander Grant, supra,* 742 F.2d at 413 (racketeering related injury alleged as a result of a pattern of mail and wire fraud); *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1070

(S.D.N.Y.1983) (plaintiffs' injuries the result of a "pervasive, ongoing and debilitating" scheme "not confined to specific monetary losses resulting from discrete acts of mail and wire fraud"). *Cf., Bankers Trust Co. v. Rhoades, supra,* 741 F.2d at 517 (racketeering related injury stems from the *pattern* of racketeering activity and not the predicate acts themselves).

Defendant's motion to dismiss for failure to allege racketeering related injury is denied.

### 4. *Enterprise*

■ Defendant also moves to dismiss Counts I and II for failure properly to plead an enterprise, as required by 18 U.S.C. § 1962, both because what constitutes the enterprise is not adequately set forth or alternatively because the enterprise alleged is defendant itself, which is impermissible under the Act. In response, plaintiffs contend that defendant is but one of the enterprises here alleged to be involved.

> In the case at bar, there are several enterprises. One is Continental itself. A second consists of a group of individuals (officials and employees of Continental) who were associated in fact for the purpose of developing and implementing the Capping Program. A third is Continental Can Company, Inc. a wholly-owned subsidiary of defendant Continental which operates the business that is involved here. Still another enterprise is that business itself or the plants covered by the magic number pension provisions.

Plaintiffs' Brief at 47. At oral argument, plaintiffs conceded that what, exactly, comprised the enterprise has not been specified in the Complaint. Transcript of Proceedings (1/16/84) at 13–14. The court agrees, and therefore directs that plaintiffs amend their complaint to allege the enterprise or enterprises involved, as required by 18 U.S.C. § 1961(4) and the Third Circuit authority interpreting that section.[20]

**20.** Title 18 U.S.C. § 1961(4) states

"enterprise" includes any individual, partner-

The court thus need not, at this point, reach the troublesome questions raised by the enterprise notion and, indeed, cannot absent a pleading of what enterprise or enterprises is/are to be alleged, as set forth by plaintiff after some reflection. *See* Transcript, *supra*, at 13–14 (plaintiffs "didn't think that [the pleading of an enterprise] was going to be a problem.") In amending their Complaint, however, plaintiffs should be aware that the Third Circuit has recently joined the Fourth, Seventh, Eighth and Ninth Circuits in holding that an enterprise and a RICO defendant may not be a single entity. *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 632–634 (3d Cir.1984). *See also Haroco*, *supra*, 747 F.2d at 399–402; *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190–91 (4th Cir. 1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Bennett v. Berg*, *supra*, 685 F.2d at 1061–62 (dismissing count in which enterprise and defendant identical). *But see United States v. Hartley*, *supra*, 678 F.2d at 988 (corporation at center of fraudulent scheme may be both defendant "person" and enterprise for purposes of § 1962). *Compare also Umstead v. Durham Hosiery Mills, Inc.*, 592 F.Supp. 1269, 1271–72 (M.D.N.C.1984) (defendant and enterprise must be distinct); *Saine v. A.I.A., Inc.*, *supra*, 582 F.Supp. at 1306–07 (same); *Kaufman v. Chase Manhattan Bank, N.A.*, 581 F.Supp. 350, 357–58 (S.D.N.Y.1984) (same); *Yancoski, supra*, 581 F.Supp. at 97; *Willamette Savings & Loan*, *supra*, 577 F.Supp. at 1426–27; *Kirschner v. Cable/Tel Corp.*, *supra*, 576 F.Supp. 234, 243 (E.D.Pa.1983); *Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20, 23–24 (N.D.Ill.1982); *Fields v. National Republic Bank of Chicago*, 546 F.Supp. 123, 124–25 (N.D.Ill.1982) *with United States v. Local 560, International Brotherhood of Teamsters*, 581 F.Supp. 279, 329–30 (D.N.J.1984) (entity may be enterprise or person, depending upon the facts in some case); *United States v. Benny*, 559 F.Supp. 264, 268 (N.D.Cal.1983); *D'Iorio v. Adonizio*, 554 F.Supp. 222, 232–33 (M.D.Pa.1982).

Defendant's motion to dismiss for failure to plead an enterprise is denied without prejudice. Plaintiffs are directed to amend their complaint within twenty days to set forth the enterprise participated in or conducted by defendant.[21]

ship, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. The Third Circuit requires that plaintiffs thus prove, though they need not plead,
(1) That the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and finally
(3) that the enterprise must be separate and apart from the pattern of racketeering activity in which it engages.
*Seville Industrial Machinery, supra*, 742 F.2d at 789–90, citing *United States v. Riccobene*, 709 F.2d 214, 221–24 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). In *Seville*, the Third Circuit made it clear that a plaintiff must identify in its pleadings the "entities it believe[s] were the enterprises that had been marshalled against it" and that such indentification is binding upon plaintiff thereafter. 742 F.2d at 790 and n. 5. *See, also Bennett v. Berg*, *supra*, 685 F.2d at 1061–62 (allowing leave to amend to properly allege enterprise); *Ralston v. Capper*, *supra*, 569 F.Supp. at 1581 (same).

21. Defendant contends in reply, and at oral argument, that even those enterprises claimed to exist by plaintiffs in their brief, cannot possibly set forth an adequate enterprise. *See*, Defendant's Reply Brief at 31; Transcript of Proceedings at 43–44. The court awaits plaintiffs' amended complaint, and full briefing by the parties to evaluate this argument. However, the court notes that plaintiff need not plead, only prove, that the enterprise alleged was separate and apart from the pattern of racketeering alleged. *Seville*, *supra*, 742 F.2d at 790. Moreover, the court is far less certain than is defendant that plaintiffs cannot allege an enterprise that is a subsidiary of defendant. *See supra* at 1510–1512. *See also Seville, supra*, 742 F.2d at 788–89; (controlling officer an enterprise within defendant corporation); *Haroco, supra*, 747 F.2d at 402–03; ("The subsection requires only some separate and distinct existence for the person and the enterprise, and a subsidiary corporation is certainly a legal entity distinct from its parent."); *Bennett v. Berg, supra*, 685 F.2d at 1061 (retirement community wholly owned by defendant an enterprise).

### 5. *Injunctive Relief*

Defendant's final attack on the Complaint seeks dismissal of plaintiffs' prayer for injunctive relief. Such attack thrusts the court into what has become an intensive debate as to the propriety of private parties seeking such relief. The debate is created by the language of the statute. Thus 18 U.S.C. § 1964(a) grants to district courts "jurisdiction to prevent and restrain violations of section 1962 of this chapter". Section 1964(b) then states, in pertinent part:

> The Attorney General may institute proceedings under this section.... Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

Section 1964(c) creates private rights of action:

> Any person injured in his business or property by reason of a violating of Section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee.

Hence, those courts and commentators arguing against the right of private plaintiffs to seek injunctive relief contend that Congress' failure to specifically allow for such relief prevents courts from inferring its existence. Such authorities point generally to the impropriety of judically creating remedies where Congress has expressly provided others, and specifically to the Supreme Court's interpretation of similar language in the Sherman act as precluding private suits for injunctive relief. *See De Ment v. Abbott Capital Corp.*, 589 F.Supp. 1378, 1382–83 (N.D.Ill.1984); *Kaushal v. State Bank of India*, 556 F.Supp. 576, 581–84 (N.D.Ill.1983); Bridges, *supra*, 18 Ga.L. Rev. at 74–77. These authorities also argue that the legislative history reveals a Congress which engrafted section 1964(c), with its damage remedy only, upon a stat-

ute already granting an injunctive remedy to the government; hence section 1964(c) appears to be an independent provision, which does not reflect the powers granted by section 1964(a). *De Ment, supra*, 589 F.Supp. at 1383; *Kaushal, supra*, 556 F.Supp. at 583. Moreover, Congress twice refused to adopt an amendment which would have expressly granted plaintiffs such right, *Sedima, supra*, 741 F.2d at 489 n. 20; *De Ment, supra*, 589 F.Supp. at 1383, quoting Bridges, *supra*, 18 Ga.Rev. at 75–76, the second time admitting that to do so would expand the remedies available to plaintiffs. *Sedima, supra*, 741 F.2d at 489 n. 20, citing *Victims of Crime, Hearing before the Subcom. on Criminal Laws and Procedures of the Senate Com. of the Judiciary*, 92nd Cong., 1st Sess. 158 (1978) (Statement of Richard Velde, Associate Administrator, Law Enforcement Assistance Administration).

Those on the other side respond primarily by invoking the traditional equity powers of the court, *Chambers Development Co., supra*, 590 F.Supp. at 1540–41, which powers are, it is argued, *nowhere* embodied in the statute, which provides equitable remedies to the government *without* requiring a showing of irreparable harm or inadequate remedies at law, but is silent as to traditional equitable relief. *Aetna Casualty and Surety Co. v. Liebowitz*, 570 F.Supp. 908, 910 (E.D.N.Y.1983) *aff'd*, 730 F.2d 905, 909 (2d Cir.1984), citing *United States v. Cappetto*, 502 F.2d 1351, 1358–59 (7th Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). *See also* G.R. Strafer, R. Massumi, H. Skolnick, *Civil RICO in the Public Interest: "Everybody's Darling,"* 19 Am.Crim.L.Rev. 655, 709–15 (1982). Additionally, these authorities contend that the language of the statute supports their position. Citing RICO's statement of findings for the proposition that RICO should be broadly construed, *Chambers Development Co., supra*, 590 F.Supp. at 1540, *see also* Note, *The Availability of Equitable Relief in Civil Causes of Action in RICO*, 59 Notre Dame L.Rev. 945 (1984), they argue first, that even section 1964(b) only allows the

government to seek relief *pendente lite.* To thus allow the government, but not private parties, to seek permanent injunctive relief is to irrationally import the terms of section 1964(a) into section 1964(b), but not into section 1964(c). *Id.* at 1540, citing J. Fricano, *Civil RICO—An Antitrust Plaintiff's Considerations,* in Current Problems in Federal Civil Practice (Prac.Law Inst. 1983). Still others argue that the language of section 1964(c), by stating that a private party "may sue ... and shall recover" treble damages rather than "may sue ... to recover" treble damages, implies the existence of other remedies. *Bennett v. Berg, supra,* 710 F.2d at 1365–66 (McMillian, J., concurring and dissenting), citing *Blakey, supra,* 58 Notre Dame L.Rev. at 331–32; Blakey & Gettings, *supra,* 53 Temple L.Q. at 1014, 1038 nn. 132–33.

 Currently, the argument rages. While the Second Circuit seems to have decided against providing injunctive relief for private parties, *Sedima, supra,* 741 F.2d at 489 n. 20, other circuits have sidestepped the issue, *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983); *Bennett v. Berg, supra,* 685 F.2d at 1064, and some district courts have continued to grant or deny applications for injunctions to private plaintiffs, without addressing the issue. *See, e.g., USACO Coal Co. v. Carbomin Energy, Inc.,* 539 F.Supp. 807, 814–16 (W.D.Ky.1982); *Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 420 (S.D.N.Y.1982); *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan,* 518 F.Supp. 993, 1014 (S.D.Tex.1981). *See also United States v. Barber,* 476 F.Supp. 182, 189 (S.D.W.Va. 1979) (dictum). Of course, if injunctive relief is appropriate at all, it is only appropriate upon a showing of irreparable harm. *See Trane Co. v. O'Connor Securities,* 718 F.2d 26, 28–29 (2d Cir.1983); *Ashland Oil, Inc. v. Gleave,* 540 F.Supp. 81, 86 (W.D.N.Y.1982). In light of the fact that the court has no way of knowing whether such harm can be shown, particularly in view of the fact that no decision has yet been rendered on class certification, as well as the possibility of plaintiffs collecting past due magic number benefits, the court deems it unwise and unnecessary to decide this issue at this time. The law is in great flux; by the time this matter is concluded, it may well be more definitive with respect to this issue. Hence, a decision by the court at this juncture would be meaningless, and purely advisory in nature.

For these reasons, the court reserves decision on the question of the propriety of plaintiffs' claim for injunctive relief, pending the trial of this matter.

CONCLUSION

Defendant's motions are disposed of in accordance with the foregoing opinion.[22] Plaintiffs are directed to submit an order in conformity herewith.

22. Plaintiffs have also moved to strike the affidavits in support of defendant's motion. This motion is denied. The Affidavit of Mr. Dwyer helpfully alerts the court to that which it should in any event be aware of; the accuracy of what are mostly public records is never disputed by plaintiffs. Most of the facts in Mr. Rexford's Affidavit are similarly conceded by plaintiffs: indeed, much of what Mr. Rexford attests to, especially in describing Continental's benefit program, confirms factual allegations in plaintiffs' Complaint. The remaining sections, mostly dealing with defendant's declining financial position, are attested to as a result of personal knowledge or access to company records. The court reads paragraph 1 of the Affidavit as indicating that Mr. Rexford read such records, as he must have to so testify. Nor are any particular records—or any particularly crucial ones—relied on, as in *Peterson v. United States,* 694 F.2d 943, 945 (3d Cir.1982), and so such records, which might well have been admissible as business records, need not have been attached. Finally, although the court doubts the admissibility of paragraphs 21 and 22 of Rexford's affidavit, it notes that plaintiffs have not contested these facts either. Indeed, plaintiffs have not contested any of the facts set forth by defendant, by affidavit or otherwise. Thus, their objection appears to be merely technical. Though perhaps motivated by commendable zeal, the court finds such objection to be against the spirit of the Federal Rules of Civil Procedure. Plaintiffs' motion to strike is therefore denied.